UNITED STATES DISTRICT COURT
DISTRICT OF RHODE ISLAND

SCOTT A. WILSON, M.D.          :
                               :
         v.                    :    C.A. No. 15-101S
                               :
UTC LABORATORIES, LLC,         :
et al.                         :

**REPORT AND RECOMMENDATION**

Lincoln D. Almond, United States Magistrate Judge

Pending before the Court are the Motions for Summary Judgment filed pursuant to Fed. R. Civ. P. 56 by Defendants Syntactx LLC and UTC Laboratories, LLC d/b/a Renaissance RX ("Renaissance RX"). (Document Nos. 20, 23). Plaintiff Dr. Scott Wilson filed Objections to the Motions for Summary Judgment. (Document Nos. 26, 31, 38, 43). This matter has been referred to me for preliminary review, findings and recommended disposition. 28 U.S.C. § 636(b)(1)(B); LR Cv 72(a). A hearing was held on December 12, 2016. After reviewing the Memoranda submitted, listening to the arguments and reviewing relevant caselaw, I recommend that Syntactx's Motion for Summary Judgment (Document No. 20) be GRANTED and that Renaissance RX's Motion for Summary Judgment (Document No. 23) be GRANTED in part and DENIED in part.

**Statement of Facts**

Renaissance RX is a New Orleans-based clinical laboratory and clinical laboratory services provider that specializes in, among other things, toxicology and DNA/molecular testing. (Document No. 24 at ¶ 1). Syntactx is a contract research organization headquartered in New York, New York. (Document No. 21 at ¶ 1). The Diagnosing Adverse Drug Reactions Study, or DART, had as its primary objective the assessment of whether the use of pharmacogenomic data resulted in a meaningful change in a subject's drug or dose regimen. (Document No. 24 at ¶ 2).

Renaissance RX sponsored the DART study, and Syntactx was its designee, or contract research organization. On or about August 26, 2013, Syntactx and Renaissance RX entered into a Consulting Agreement pursuant to which Syntactx provided specific services to Renaissance RX in conducting the DART study pursuant to a series of work orders. Included within the scope of services was assisting Renaissance RX with contracting with eight Regional Sites and 160 Participating Sites selected by Renaissance RX for the DART study. Syntactx staff also collected all essential regulatory documents, including, among other things, signed Statement of Investigator, Investigator signed protocol/title pages, Investigator signed protocol amendments, Clinical Trial Agreements, curricula vitae for the principal investors and subinvestigators. These regulatory documents were submitted to Copernicus Group IRB, the Independent Review Board responsible for overseeing the DART study. (Document No. 21 at ¶ 3).

In or about October 2013, Lori Stalker, an employee and General Manager of Renaissance RX, solicited Dr. Wilson to participate in the DART Study. (Document No. 21 at ¶ 4). Defendants contend that on January 21, 2014, Wilson electronically signed his name as a "Regional Principal Investigator" (RPI) on the Investigator Site Questionnaire for submission to the principal Institutional Review Board for the DART registry. (Document No. 24 at ¶ 5). Plaintiff does not deny this, but has "no recollection of completion, review or return" of the document. (Document No. 42 at ¶ 5). Dr. Wilson provided a Curriculum Vitae, signed and dated February 6, 2014, to Syntactx for submission to Copernicus Group IRB. (Document No. 21 at ¶ 6). Syntactx submitted the documents, along with a copy of Dr. Wilson's medical license, to Copernicus Group IRB. (Document No. 21 at ¶ 7).

When a Principal Investigator (PI) is added within a RPI's region, Syntactx sends notice to the PI of the RPI assigned to his or her region, copying the RPI on such notices. (Document No. 24 at ¶ 6). Wilson was provided with multiple notices of a PI added to his region, and Wilson's name was

identified as "Your Regional Principal Investigator who has obtained full Institutional Review Board approval" in each instance. (Document No. 24 at ¶ 7). Dr. Wilson and Philip Berguron signed a DART Clinical Trial Agreement on January 31, 2014. (Document No. 21 at ¶ 11). Dr. Wilson also signed an Investigator Agreement, a Financial Disclosure and a protocol signature page on January 31, 2014. (Document No. 21 at ¶ 12). Dr. Wilson completed training on the DART Study conducted by Lori Stalker of Renaissance RX on February 3, 2014, and Dr. Wilson signed a training log verifying that fact. (Document No. 21 at ¶ 13).

In April 2014, Dr. Wilson was copied on ten emails that were sent to newly-activated site investigators informing them that Dr. Wilson was their Regional Principal Investigator. (Document No. 21 at ¶ 16). On April 2, 2014, approximately three months after his appointment as RPI, Wilson wrote to Lori Stalker asking, "How are we doing at finding a replacement for me as PI?....With what we potentially have going on with you guys in the near future I'd like to get this outta the way." (Document No. 24 at ¶ 8). On April 10, 2014, Wilson again wrote to Lori Stalker, "Where are we on replacing me as regional PI?" (Document No. 24 at ¶ 9). That same date, Lori Stalker wrote to Syntactx, "We have a Regional PI that would like to be replaced. He is unable to fill the role and has asked I remove him." Sophia Ly, Clinical Project Manager at Syntactx, responded by stating that, "We will need to complete a PI transfer submission to IRB for this replacement. To do this we will require Dr. Wilson's assistance to submit this documentation." (Document No. 24 at ¶ 10). In response to email correspondence sent on April 21, 2014 to Dr. Giardina, a new PI in Wilson's region, Wilson asked, "Do we have a date for when Dr. Morano will be replacing me as regional PI?" (Document No. 24 at ¶ 11).

On April 22, 2014, Elizabeth Ouriel, Associate Project Manager at Syntactx, forwarded a Principal Investigator Transfer Form from Copernicus Group IRB to complete Wilson's replacement

as RPI. (Document No. 24 at ¶ 12). Wilson did not execute the form and instead sent an email regarding a prospective position at Renaissance RX on June 19, 2014 stating, among other things, "I would very much be up to the challenge, but as I mentioned to Brandy, I wouldn't want to cut myself out of too much of the prospective dollars likely to flow to us as we have so many more sites in the cue to come on board as soon as Syntaxis (sp) cooperates." (Document No. 24 at ¶ 13). Wilson sent another email on June 19, 2014, that stated, in relevant part, as follows:

> Interestingly…I wonder if I am a W2 employee/consultant and not being paid on volume…would I be able to resume doing Dart/Utopia at my Cumberland, Slatersville, Pawtucket, Smithfield, Westerly & Fall River, MA offices? This would be more for Brandy, but this is why I haven't revoked my regional PI responsibilities (on paper) as if I'm not paid on volume and I got a stable w2 employee check – that could be a game changer?"

(Document No. 24 at ¶ 14).

On July 7, 2014, Wilson sent an email to Tony Remington, the then Chief Commercial Officer of Renaissance RX, about assuming a clinical role with Renaissance RX, provided that Mr. Remington was "able to get approval for the $20k/month based on my income as a justification, if that's even needed." (Document No. 24 at ¶ 15). Wilson noted that he was "seemingly neglected" when offers of employment were made to his associates and cautioned that his "ego is too large to not have it massaged" and that his treatment "makes [him] feel like [he has] to enroll in the anger management classes that [he] quit last week." (Document No. 24 at ¶ 16).

Because Dr. Wilson declined to sign the transfer documents that would end his responsibilities as RPI, Syntactx completed the Principal Investigator Transfer Form on Dr. Wilson's behalf, and Dr. Wilson was closed out as an RPI by Copernicus Group IRB on or about September 10. (Document No. 24 at ¶ 17). On September 30, 2014, Renaissance RX advised Wilson of this fact. (Document No. 24 at ¶ 18). Dr. Wilson's license to practice medicine in the State of Rhode Island is currently in good

standing. (Document No. 24 at ¶ 21). To date, he has not been sued as a proximate result of the conduct of Renaissance RX. (Document No. 24 at ¶ 19). Dr. Wilson also has not had a judgment rendered against him as a result of the conduct of Renaissance RX. (Document No. 24 at ¶ 20).

**Summary Judgment Standard**

A party shall be entitled to summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). When deciding a motion for summary judgment, the Court must review the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in the nonmoving party's favor. Cadle Co. v. Hayes, 116 F.3d 957, 959 (1st Cir. 1997).

Summary judgment involves shifting burdens between the moving and the nonmoving parties. Initially, the burden requires the moving party to aver "an absence of evidence to support the nonmoving party's case." Garside v. Osco Drug, Inc., 895 F.2d 46, 48 (1st Cir. 1990) (quoting Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986)). Once the moving party meets this burden, the burden falls upon the nonmoving party, who must oppose the motion by presenting facts that show a genuine "trialworthy issue remains." Cadle, 116 F.3d at 960 (citing Nat'l Amusements, Inc. v. Town of Dedham, 43 F.3d 731, 735 (1st Cir. 1995); Maldonado-Denis v. Castillo-Rodriguez, 23 F.3d 576, 581 (1st Cir. 1994)). An issue of fact is "genuine" if it "may reasonably be resolved in favor of either party." Id. (citing Maldonado-Denis, 23 F.3d at 581).

To oppose the motion successfully, the nonmoving party must present affirmative evidence to rebut the motion. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256-257 (1986). "Even in cases where elusive concepts such as motive or intent are at issue, summary judgment may be appropriate if the nonmoving party rests merely upon conclusory allegations, improbable inferences, [or]

unsupported speculation." Medina-Munoz v. R.J. Reynolds Tobacco Co., 896 F.2d 5, 8 (1st Cir. 1990). Moreover, the "evidence illustrating the factual controversy cannot be conjectural or problematic; it must have substance in the sense that it limns differing versions of the truth which a factfinder must resolve." Id. (quoting Mack v. Great Atl. & Pac. Tea Co., 871 F.2d 179, 181 (1st Cir. 1989)). Therefore, to defeat a properly supported motion for summary judgment, the nonmoving party must establish a trialworthy issue by presenting "enough competent evidence to enable a finding favorable to the nonmoving party." Goldman v. First Nat'l Bank of Boston, 985 F.2d 1113, 1116 (1st Cir. 1993) (citing Anderson, 477 U.S. at 249).

**Discussion**

In his Objections to the Motions for Summary Judgment, Dr. Wilson identifies several factual issues, which he claims are material and preclude entry of judgment at this time. The Court will discuss the Counts in turn.

**A. Breach of Contract and Breach of Duty of Good Faith and Fair Dealing**

Counts I and II of the Complaint allege breach of contract and breach of duty of good faith and fair dealing against Renaissance RX only. As to the claim for breach of contract, Dr. Wilson's Complaint asserts that Renaissance RX breached the Trial Agreement and the Investigator Agreement by "noncompliance with relevant regulations and laws, including, without limitation, HIPAA." (Document No. 1-1 at ¶¶ 65-72). Renaissance RX moved for summary judgment, arguing that Dr. Wilson lacked standing to bring any claim pursuant to HIPAA and also that Dr. Wilson's claim is legally insufficient because he has no competent evidence of damages. (Document No. 23-1 at pp. 11-15). In his Objection to the Motion to Dismiss (Document No. 41), Dr. Wilson elaborated that Renaissance RX "imposed obligations, responsibility, liability and a title on Dr. Wilson – despite the Trial Agreement's full-integration clause – beyond those obligations permitted by the Trial (or

Investigator) Agreement." Id. at p. 7. He also contends that Renaissance RX's conduct violated Section 13 of the Trial Agreement which prohibits the use of a party's name in "advertising or publicity" without consent. Id. Finally, Dr. Wilson asserts that summary judgment should not enter because there are "factual issues regarding whether UTC's failure to perform its obligations pursuant to the Trial and Investigator Agreements caused Dr. Wilson to sustain damages, including, without limitation, lost profits, damage to Dr. Wilson's Business, exposure to civil liability and the potential loss of his ability to practice medicine...." (Document No. 41 at p. 9).

The Clinical Trial Agreement is governed by Louisiana law. (Document No. 21-5 at p. 6, § 19. Under Louisiana law, "[t]he essential elements of a breach of contract are threefold. First, a plaintiff in a breach of contract claim must prove that the obligor undertook an obligation to perform. Next, they must prove that the obligor failed to perform the obligation, resulting in a breach. Finally, the failure to perform <u>must result in damages</u> to the obligee. Generally, the damages in breach of contract cases are governed by the four corners of the contract." <u>Sanga v. Perdomo</u>, 167 So. 3d 818, 822 (La. Ct. App. 2014), writ not considered, 176 So. 3d 1032 (La. 2015), and writ denied, 172 So. 3d 650 (La. 2015) (internal citations omitted) (emphasis added). Additionally, "[a]s a general rule, Louisiana recognizes an implied covenant of good faith and fair dealing in every contract. The Louisiana Civil Code requires contracts to 'be performed in good faith.'" La. Civ. Code Arts.1983, 1759. <u>Occidental Chemical Corp. v. Louisiana Pub. Serv. Comm'n</u>, 494 F. Supp. 2d 401, 416 (M.D. La. 2007) (internal citations omitted).

After considering the competing arguments and evidence presented, I find that summary judgment is appropriate because Plaintiff has not identified any competent, non-speculative evidence to support any claim for actual contract damages. In his Opposition, Plaintiff asserts that he has sustained damages including lost profits, business damage, "exposure" to civil liability, and the

"potential" loss of his ability to practice medicine. (Document No. 41 at p. 9). As supporting evidence, Plaintiff relies exclusively on his Second Declaration which is entirely conclusory and devoid of citation to any competent evidence supporting his alleged damages. Id. at pp. 9-10. Plaintiff argues that "there are significant and substantial factual issues as to the damages" he allegedly sustained. Id. at p. 10. However, rather than quantify and identify evidence supporting his claimed damages, Plaintiff poses several open-ended questions in his Memorandum as to his potential future damages such as "What is the extent of [Plaintiff's] lost profits?" and "What is the damage to [Plaintiff's] Business and/or his erstwhile interest In Partners In Clinical Research?" Id. at pp. 10-11. Plaintiff's showing simply does not meet his burden under Rule 56(e), Fed. R. Civ. P., to properly support his assertion of claimed damages. Accordingly, I recommend that Defendant Renaissance RX's Motion for Summary Judgment (Document No. 23) as to Counts I and II be GRANTED.

### B. Unjust Enrichment

Count III of Dr. Wilson's Complaint alleges that Defendants were "unjustly enriched" by using Dr. Wilson's name/likeness to their benefit. Rhode Island law controls this common law claim. In his Complaint, Dr. Wilson states that "without a qualified RPI in place to oversee each of the Unauthorized Sites, [Defendants] would have been unable to conduct the Unauthorized swabs. Given the Defendants' use of Dr. Wilson as an RPI without his permission, and the Defendants' failure to remove Dr. Wilson as an RPI immediately upon receipt of his request to that effect, permitting the Defendants to retain the monies generated...would be inequitable." (Document No. 1-1 at ¶¶ 76-77). At the hearing, Dr. Wilson's counsel claimed that the unjust enrichment claim was the "easiest to make out" because Defendants used Dr. Wilson's name to their benefit.

Rhode Island's courts have not addressed a common law claim of unjust enrichment that seeks recovery for the commercial use of an individual's name or likeness. However, in 1988 District Judge

Lagueux issued a lengthy decision that discussed the origins of the claims for "right to privacy" and "misappropriation of likeness" in Rhode Island, which guides the Court on the present issue. That case concerned a famous photograph published in Life Magazine that depicted a sailor kissing a nurse in Times Square shortly after the announcement of the Japanese Surrender during World War II. See Mendonsa v. Time, Inc., 678 F. Supp. 967, 968 (D.R.I. 1988). The sailor, George Mendonsa, brought statutory claims for misappropriation of likeness under R.I. Gen. Laws §§ 9-1-28 and 9-1-28.1. Id. Judge Lagueux traced the right to privacy, noting that Rhode Island has never recognized a common law action for right of privacy, but that the Rhode Island General Assembly ultimately enacted legislation to recognize the right and that the legislation was "modeled after that New York Statute." Id. at p. 970. Judge Lagueux observed that Rhode Island's Supreme Court had not interpreted the statutes concerning loss of right to privacy, but that the Court would, "in all probability, look to the large body of New York law interpreting similar language" in the New York statute. Id. at p. 970-971.

This Court is once again faced with a question that the Rhode Island Supreme Court has not directly answered. In this case, the question is whether Rhode Island's courts would recognize a common law claim for unjust enrichment that arises out of a violation of the right to privacy. Just as the Court looked to New York for guidance in 1988, the present Court considers a New York case that analyzed a similar issue. In a 2002 New York case, a plaintiff alleged that defendant "made money off of plaintiff's name, image and likeness and copies thereof without paying plaintiff for such uses and should be made to share such monies with plaintiff." Zoll v. Jordache Enters., Inc., No. 01 CIV. 1339 (CSH), 2002 WL 31873461 at *15 (S.D.N.Y. Dec. 24, 2002). The Zoll Court noted that the New York statute regarding the right to privacy was created "expressly because there was no common law recognition of claims for violations of the right of privacy." Id. The Court noted that:

> plaintiff does not articulate a common law privacy or publicity claim and instead brings common law claims for unjust enrichment and trespass. This does not, however, save plaintiff from the rule precluding common law right to privacy and right to publicity actions because her claim is, in substance, based on the unauthorized use of her image for commercial purposes. Where a claim arises from unauthorized use of an image or likeness, plaintiffs have not been allowed to advance common law claims in addition to their statutory claims merely by recasting the statutory claim as a common law claim.

Id. at p. 16.

The New York Court was clear that a statutory right to privacy claim disguised as a common law unjust enrichment claim would be barred. Considering the analysis of the New York Court and the similarity of the statutes, this Court concludes that Rhode Island's Supreme Court would also bar such a claim if presented with the issue. The Zoll Court observed that New York courts "have declined to recognize an independent, common law cause of action in right to privacy or publicity for unauthorized use of an image or likeness and have instead treated common law claims premised on the unauthorized use of a plaintiff's name, image or likeness as privacy claims that must proceed under the statutory cause of action...." Id. at p. 15. Here, Dr. Wilson is also seeking to advance a statutory claim for right to privacy disguised as an unjust enrichment claim. Given Judge Lagueux's analysis of the statutory right of privacy in Rhode Island, along with the New York Court's determination that a common law claim is barred under these circumstances, the Court recommends that Defendants' Motions for Summary Judgment (Document Nos. 20 and 23) be GRANTED as to Count III.

**C.  Deprivation of Right to Privacy**

Plaintiff's fourth cause of action is a statutory claim for deprivation of right to privacy pursuant to R.I. Gen. Laws § 9-1-28.1. In his Complaint, Plaintiff alleges that Defendants used his "name and credentials, his Business, his personal information, documents and property in connection with the DART Study without permission from Dr. Wilson and notwithstanding his refusal to enter into the

Proposed Consulting Agreement." (Document No. 1-1 at p. 13). Dr. Wilson pleads that he "agreed to serve as the SI [sub-investigator] for the Partners Sites with respect to the DART study" (Document No. 1-1 at p. 5), but that he "rejected the offer" to become an RPI. Id. Nevertheless, he claims that he was "listed on DART Study publications and materials as an RPI" from approximately January through September 2014. Id. at p. 9. At the hearing, Plaintiff's Counsel noted that the claim was pursuant to R.I. Gen. Laws § 9-1-28.1(a)(2) for appropriating Plaintiff's name, and pointed the Court to a recent decision of the Rhode Island Superior Court in Rompf v. International Tennis Hall of Fame, No. NC-2016-0053, 2016 WL 4534211 (R.I. Super. Ct. August 25, 2016). In Rompf, the former "Head Tennis Professional" at the Hall of Fame sued for misappropriation of name under R.I. Gen. Laws 9-1-28.1(a) when her name and photograph remained advertised on the Hall of Fame's website after her termination of employment on November 6, 2014 and through May 2015. On a Motion to Dismiss, the Superior Court found that Ms. Rompf had sufficiently pled a cause of action under §9-1-28.1. Id. at *3.

In Rompf, the Court reiterated that to set forth a claim under subsection (a)(2) of R.I. Gen. Laws § 9-1-28.1, a plaintiff must establish an "act done without permission of the claimant" as well as that the "act is of a benefit to someone other than the claimant." Id. Syntactx contends, and this Court agrees, that Plaintiff has failed to identify any competent evidence that Syntactx reaped any benefit as a direct result of Dr. Wilson allegedly being misrepresented as an RPI instead of an SI. The evidence presented indicates that Syntactx simply collected documents and submitted them to an Independent Review Board via work orders from Renaissance RX. The Court therefore recommends that Syntactx's Motion for Summary Judgment on Count IV be GRANTED. The evidence presented regarding Renaissance RX indicates that it was involved in solicitation of Dr. Wilson to serve in the DART Study, and that it identified him as an RPI in publications and materials disseminated in the

public domain. Renaissance RX bases its argument as to Count IV solely on its position that Plaintiff agreed or consented to act as an RPI. However, Plaintiff has presented sufficient evidence to establish that there is a genuine issue of material fact as to whether or not he ever knowingly consented or agreed to serve as an RPI. Accordingly, I recommend that Renaissance RX's Motion for Summary Judgment on Count IV be DENIED.

**D.     Fraud**

In Count V, Plaintiff alleges that "UTC and Syntactx intentionally concealed from SIs the submissions of improper ICD-9 Codes and V-codes on the order forms for the 'swabs' conducted within the context of the DART Study by automatically pre-populating the order forms with the improper codes and the unauthorized electronic signatures of the SI for the DART Site in question, including, with respect to the Partner Sites, that of Dr. Wilson." (Document No. 1-1 at p. 14). "Defendants intentionally misled the Region DART Sites with respect to Dr. Wilson's putative RPI role and/or status with respect to the DART Study." Id. "As a result of the concealment by the Defendants, Dr. Wilson's electronic signature is contained on an unknown number (but nonetheless likely several thousand) of eCRFs and order forms bearing incorrect codes." Id. Plaintiff also alleges because he was held out as an RPI, he "was ostensibly responsible for the oversight of an unknown number of DART Sites at which similar fraudulent concealments took place...." Id.

The fraud claim set forth by Dr. Wilson is subject to the "heightened pleading requirements of Rule 9(b), which 'applies to state law fraud claims asserted in federal court.'" W. Reserve Life Assurance Co. of Ohio v. Caramadre, 847 F. Supp. 2d 329, 336-337 (D.R.I. 2012) (quoting N. Am. Catholic Educ. Programming Found., Inc. v. Cardinale, 567 F.3d 8, 13 (1st Cir.2009)). "These claims must 'specify the who, what, where, and when of the allegedly false or fraudulent representation.'" Id. (quoting Alternative Sys. Concepts, Inc. v. Synopsys, Inc., 374 F.3d 23, 29 (1st Cir.2004). "Rule 9(b)

also requires 'identifying the basis for inferring scienter,' which refers to the culpable mental state of knowingly or intentionally committing fraud.'" Id. (quoting N. Am. Catholic Educ., 567 F.3d at 13).

In the Complaint, it is clear that Dr. Wilson alleges the fraud claim is based on alleged concealing of improper coding of the swabs taken during the DART study. Both in his Objection and at the hearing, Plaintiff's fraud claim does not resemble the one alleged in the Complaint. Instead, Plaintiff argues that there are genuine issues of fact as to whether Dr. Wilson relied on Ms. Stalker's or UTC's representations regarding Dr. Wilson's liability as an RPI or Dr. Singh's role as "Rhode Island RPI" as an inducement to "enter into the Proposed Consulting Agreement." (Document No. 41 at p. 17). Dr. Wilson's Objection also queries whether UTC or Sytactx were "intentionally misleading in its 'Transfer Form' regarding Dr. Wilson's Principal Investigator role" or attempted to "keep Dr. Wilson confused as to his RPI-status" so that Defendants could "generate substantial revenue from the use of his name?" Id. Plaintiff poses a few more hypothetical questions which he claims "require factfinder determinations" and are "inappropriate at this stage of the litigation." Id. at p. 18. At the hearing, Plaintiff's counsel referenced the fraud claim as encompassing the "deliberate misleading of Dr. Wilson" and the inclusion of Dr. Singh as the RPI.

Regardless of which avenue Plaintiff is attempting to pursue in his fraud allegation, none of the questions posed relate to the fraud count actually pled in the Complaint. Plaintiff's Complaint is devoid of factual allegations supporting any of his newly presented fraud allegations.[1] Thus, the Court must conclude that Plaintiff has abandoned the fraud claim made in Count V of his Complaint and that his new fraud claim is not properly pled. Accordingly, I recommend that the District Court GRANT Defendants' Motions for Summary Judgment on Count V. (Document Nos. 20 and 23).

**Conclusion**

---

[1] Plaintiff never sought leave to amend Count V to assert these new fraud theories.

For these reasons, I recommend that the District Court GRANT Renaissance RX's Motion for Summary Judgment as to Counts I, II, III and V and DENY it as to Count IV. (Document No. 23). I further recommend that the District Court GRANT Syntactx's Motion for Summary Judgment as to all Counts against it. (Document No. 20). Any objection to this Report and Recommendation must be specific and must be filed with the Clerk of the Court within fourteen days of its receipt. See Fed. R. Civ. P. 72(b); LR Cv 72. Failure to file specific objections in a timely manner constitutes waiver of the right to review by the District Court and the right to appeal the District Court's decision. See United States v. Valencia-Copete, 792 F.2d 4, 6 (1st Cir. 1986); Park Motor Mart, Inc. v. Ford Motor Co., 616 F.2d 603, 605 (1st Cir. 1980).

 /s/   Lincoln D. Almond
LINCOLN D. ALMOND
United States Magistrate Judge
April 27, 2017